Ron, this is the first case of the morning, Fall 208-569, Utah State of Illinois v. Noel Quevedo. On behalf of the Appellate, Mr. Mark G. Levine. On behalf of the Appellate, Mr. Jerry W. Taylor. Good morning, everyone. I am Mark Levine, representing, as I said, the Appellant, Noel Quevedo, from the Office of the State Appellant Defender. The first thing this morning, I have a motion to file to cite additional authority. I spoke with my opposing counsel about this. To cite the shimming case that this Court decided last month that sets out a survey of the law in the standard review. Any objection, Mr. Jacobs? No objection. The motion will be allowed. Thank you. For the standard review, the reason I mention this first, in the original brief we relied on an opinion of this Court in a case called Rubio. That opinion has since been withdrawn and a new opinion issued. Standard review is like it says in shimming. That is to say, it's de novo as to whether what was said was a request for counsel and it's a manifest way to the evidence standard as to what was said. Here, there's no question of what was said because we have a videotape of the entire interrogation. The videotape, although it was in Spanish, but we also have a translated transcript of everything that was said and the parties stipulated that the translation was accurate. So the only question is whether what was said will be a request for counsel. You're suggesting it's a question of law and not the manifest way. Well, as this Court said in a footnote in Vasquez or so, in a situation like this, it really amounts to the difference is pretty much academic because there's actually no question. I know this Court has said that the standard is a way to the evidence, manifest way to the evidence as to what was said, but there's no question about what was said. There was testimony and hearing about it, but nothing pertinent to this issue was said at the hearing. Well, is intent involved here? Intent? In other words, intent is a state of the mind which sometimes may be established through circumstantial evidence such as what people say. Unless it's an admission or a confession, it doesn't necessarily do anything other than imply or infer something. Their actions may give rise to an inference or an implication. Certainly. So the mere fact that there are words there doesn't necessarily mean that it's established what his intent was. Your Honor, this Court said that the standard review on the factual issues like that is the manifest way to the evidence, and if this Court says that, then I certainly believe it. That's what the manifest way to the evidence is, the standard of review as to what was said. The point is we don't have any real question about what was said. This is the second time you've said what was said. What about what was said? We have also in the record the videotape of the interrogation, which is the same videotape that the trial court had. So the trial court didn't have any access to any information that this Court doesn't have. I'm looking at the very same video. The law, this is how a reasonable police officer would view this situation. Not how we would view it or you would view it, but a reasonable police officer in the context of what was being said. Yes, Your Honor. The trial court ruled basically that a reasonable police officer would find perhaps under the situation that the defendant was confused, and then the officers went on to explain a little bit more about the rights. And that's the main point of my argument this morning, exactly what you raised. That is the standard. The implication of counsel is stated two ways. One is the way you just said it. Another is that the statement can reasonably be construed as an expression of desire for assistance of counsel. Probably the same, but there are alternate ways of saying it. Here, the videotape and the transcript shows that the officer, the detective who was doing the interrogation, actually did understand that he had requested counsel. Let me back up for a second for what led up to this, if I might. This is Detective Trujillo told Mr. Covado, you have a right to an attorney and you have a right to have him with you. So, Covado said, and this is on A13 in the appendix to my brief. He said, that will be fine, but, well, there's no money. Well, this is not a request for counsel yet. He said, well, there's no money. Then the detective says, if you desire services of an attorney, one will be named to represent you without any cost to you. To which, Covado responded, oh, I understand, all right. That could still possibly be ambiguous, but it gets cleared up very quickly. Because then the detective asked him to sign the initial waiver of counsel. And Covado says, uh-huh, then we're still going to wait until the attorney arrives. What the detective said next is what clinches it. This shows that Detective Trujillo knew for sure exactly what, that Covado had expressed a desire for counsel. He said, then you don't want to talk to us? You don't want to discuss the reason why we're here? You're asking for, and then he stops in the middle of the sentence. At that point, the bright line has been reached, the bright line established in Edwards. Once the defendant invokes his right to counsel, police cannot interrogate him further unless he initiates further communication. And you know the law. I don't need to go through the law. The essence here is what was said on the transcript. The officer, a reasonable officer, and I don't think the State's going to contend that he was unreasonable, this particular reasonable officer, under these particular circumstances, actually did understand that he had expressed a desire for counsel. Therefore, the motion to suppress the statements that came after it should be granted. If you make yourself or say something in effect that's well done, it'll take a while for us to get the lawyer for you. Later on, after this happened, Covado said, can the lawyer come right now? And the officer said something like what you just said. I don't remember the exact words, but no, he can't come right now was in effect what he said. But the point is we'd already passed the bright line. Didn't Covado then say something like, well, then that event, I'll talk to you without my lawyer? Yes, he did. That makes this case just like the Smith case, the U.S. Supreme Court case, where he requested counsel, and then in the next sentence or two, backtracked and agreed to be questioned without counsel. After that conversation that you just cited where then you're still going to wait until the attorney arrives, and then he goes, Trujillo says you're asking for, there's an interruption. There are several other back and forth where if, again, reading the words that you say are pretty clear on their face, no, wait, I want to make sure you understand what you're doing. Oh, I do. All right. No, no, I want to make sure you understand. They're still going back and forth about whether he wants an attorney. So how can you say it's crystal clear at that particular point? Because Edwards set up a bright line rule, and like in Smith, if you read in the Smith opinion of the court, it sets out their little part of the transcript, and it was in, if not the next sentence, the very next sentence, then two or three sentences later in which the defendant in Smith said, oh, all right, if you insist or something to that effect, I'll talk to you. I don't think he didn't say if you insist. Oh, all right, I'll talk to you. And it happened right after. And the whole point of that case was that it is this bright line. Once the detective understands, that's it. Think period. And what happens after that, even seconds after that, really doesn't matter. Well, but I'm not so sure. He was interrupted. You're asking for now your client. All right. Okay, all right. Now the officer. No, no, no. Wait. Understand what you're doing first. He's still talking to him about do you understand. Yes. And he says yes. Yes. He says, do you understand what you're doing? But look at what the detective just said to him. Then you want it. Then then you don't want to talk to us about what you're you don't want to discuss the reason why you're here. You don't want to talk to us. That was what came just before this. So you can look at this language that you're putting right afterwards. They're saying, are you sure you don't want to talk to us? Understand what you're doing here. Later on. Now, this is not legally relevant to this bright line because it happened later. But later on in the discussion, the detectives tells him, if you don't talk to us, then we're not going to know your side of the story. I think this is standard interrogation technique. We're not going to know your side of the story. And the state's attorney is going to go ahead and decide whether to charge you and your wife without ever having heard your side of the story. Now, this is, of course, is a standard interrogation technique, but it shows it gives the defendant a reason. Gee whiz, do I want to not talk to them right now? Maybe I better. Maybe I better think about this. So when the officer was saying to him over there, wait, wait, understand what you're doing. Are you sure you don't want to talk to us? But this kind of persuasion, even gentle, like in Smith and Quick, is exactly what's prohibited. The rule in Edwards is designed to prevent the police from badgering a defendant into giving up his rights. Now, badgering, effective badgering, is done nicely. We don't beat people anymore. Generally, it's not an effective interrogation technique. But showing them that it's in their interest to tell us your story so the big bad state's attorney doesn't make the decision without having ever heard what you had to say. So it's in your interest to talk to us, so you should go ahead and waive counsel. That's what was happening here, and that's what's prohibited here. Do you think that your argument, to some extent, goes by the fact that the court reporter, whoever transcribed this, put a period instead of a question mark? Because when the defendant says, then we're still going to wait until an attorney arrives, there's a period at the end of that in the transcript. If there had been a question mark, if it had simply, if, for instance, the defendant had said, are we going to wait for an attorney to come here then? I mean, you would probably agree then that that's just a question, and the officer can answer the question or not answer the question. It's pretty equivocal if it's a question. So my question to you is, does it turn on the fact that there's a period there, and maybe it was a question that was being asked as opposed to a statement made by the defendant? No, I think it helps Appellant's argument that it's a period, but I don't think it's essential that it's a period. Because even if it were a question mark, the question assumes that an attorney is coming. Are we going to wait? Or what? I don't know. But that assumes that he's already expressed his desire for an attorney, and he thinks an attorney is coming. But doesn't it show confusion? If it's a question, it shows more confusion as to whether an attorney's here now. Is there an attorney sitting outside the room right now? I don't know. Even if it did show confusion about that, it doesn't show confusion about whether he wanted an attorney. It shows confusion about what's going to be our procedure this morning. What are we doing over here? It's the middle of the night, actually. What are we doing? What's the procedure going to be? It does not show confusion about whether he wanted an attorney, and that's the essential point. You said there were video tapes that you have. Yes, Your Honor, that are in the record. If you're watching the video tape, you might hear the inflection in his voice, and you might come to a different conclusion, that it was not a declarative statement or declaratory statement. It was an interrogative or a question. The videotape, of course, is in Spanish. The parties stipulated that this translation was accurate, so I'm going to have to go by that. As I said to Justice Burke just now, even if it were a question, the question still assumes that he has been understood, that he wants an attorney and an attorney is coming. Why would an attorney be coming if he didn't want an attorney? The question, even if it was a question, that assumes that an attorney is coming, which assumes that the officer has understood that he wanted one. So either way, question or not a question, either way it comes out the same. On the second point, if I may go on. On the second point, the mental state required for this form of first-degree murder is defined by statute. Statute says, he knows that such acts create a strong probability of death or great bodily harm. The issue raised in the second point is whether that's two mental states or a single mental state. Now if it's two distinct mental states, you would think that it would be possible for a person to be guilty under this one and not guilty under this one, or guilty under this one and not guilty under that one. They're distinct, right? But when we look at it, it's not that way. It's not, because nobody could ever be guilty of knowingly creating a strong probability of death while not being guilty of knowingly creating a strong probability of great bodily harm. Why? Let me think of this. I knew what I was doing would probably cause death, but great bodily harm? No, that never occurred to me. That doesn't make any sense. If you know it's going to probably cause death, obviously it's going to cause great bodily harm. Death is a form of great bodily harm. It's the greatest form of great bodily harm. Wouldn't that make that phrase surplusage, then? Precisely. Why would the legislature put that in? Aren't we supposed to give effect to the words that they put on the paper? They put it there for some reason. Precisely. And that's precisely my argument. Why did they put it there? What, for decoration? Is that what it's there for? Just sloppy drafting? We're not supposed to read statutes like that. We're supposed to assume that the legislature meant what they said. And they didn't put in extra words. You want us to depart from Dunmore? Precisely, yes. I mentioned Dunmore in my brief. I know Dunmore was decided very recently, but I want to make this argument anyway. The answer is, why it's not just decoration, why it's not surplusage, is that the legislature intended a single mental state here that includes the possibility, maybe this will cause death, maybe it will cause great bodily harm, but together, collectively, that result, one of those results, either one or the other, collectively, that result is strongly probable. Counsel, your time is up. I'm sorry? Your time is up. We have no other questions. You'll have a chance to make a comment. Thank you, Your Honor. Good morning. Good morning. Barry Jacobs on behalf of the Appalachian people of the state of Illinois. Please support and counsel. In this case, the defendant was charged with four counts of first-degree murder for causing the death of his infant son, Alex. He was found guilty at bench trial of strong probability murder under 720 LCS 59182. He caused the death of his son knowing his acts created the strong probability of death or great bodily harm. He was sentenced to life imprisonment under what was believed to be mandatory sentencing. Do you agree that the first issue that counsel raised in the brief is, under these circumstances, is a de novo review? Listening to Your Honor's questions, I did agree in the brief that the ultimate legal question of whether or not these statements should have been admitted, based upon the fact that the parties did stipulate to the videotape, was de novo. However, I do agree with Justice McLaurin's statements that, of course, the videotape was available and played in court. And so there is some assessment made by the court, or could have been an assessment made by the court, although it didn't refer to it, regarding the inflection and certain statements made, how those were delivered, and those would go to, I guess, the issue of intent. So to that extent, I don't disagree that, although the court didn't make specific findings regarding what was said on the videotape based on the videotape, it is a tricky application. Well, the state sought to introduce the videotape, I assume. Yes. So why did you do it? Or not you personally, but why did the state seek to introduce it? What did they want to use it for? I'm not exactly sure since it was in Spanish. I don't know. They also stipulated to the transcription, so I'm assuming that that was some sort of middle ground. Well, if they stipulated to the translation, then the court could just read it. But there had to be a purpose for looking at that videotape, a purpose for introducing that videotape. I'm assuming it was for that very purpose, to allow the court judge to see exactly how these statements were made. I don't know what value it would have been if he did not refer to it specifically. Well, but it would possibly establish whether the badgering was gentle or harsh. Of course. Of course. And I would point out that each of these interviews, and there were three, lasted approximately an hour and 15 minutes each. The first one was done approximately 24 hours after the incident where the defendant's son was harmed, I believe on March 2nd, around 11 at night. There was a subsequent interview done around 8.15 the following day on March 3rd, which did not get recorded. And then a third recorded interview, probably three hours later, about 11.45 p.m. on March 3rd. So I don't know where I was going with that. Well, if the court had made findings based on the tape itself, we have the tape in evidence. We can view the tape. And under Edison Insurance Company v. Fay, we can view that just like the trial court could. So it would still be de novo review. Correct. Okay. What about sentencing? I'm sorry? What about sentencing? The third issue raised. Based upon my reading of what I call the Public Act, as well as People v. Wooters, which was in 1999, that particular sentencing provision was declared to violate the single-subject rule of the Constitution. It was never reenacted, the particular provision requiring mandatory life sentencing. I actually spoke with the representative's office who had originally sponsored it. His explanation was that the act died in committee. I think based on that, at the time that this defendant was sentenced, the prevailing statute did not require that he be sentenced to mandatory life imprisonment. Well, what about remand for resentencing? Or should we impose the sentence? The judge seemed to be inclined to let it be. He's no longer on the bench. If we send it back, it's going to be going to someone who has no experiential background in the facts in this case. We've already looked at the record. Why shouldn't we do it? Or put another way, what's your opinion on the issue? I won't put words in your mouth. It is hard to say. I trust that Your Honors have obviously the same evidence that would be presented before a new sentencing judge. However, it is within the purview of the trial court to impose a sentence. I guess my only reservation might be... Is it fair to say that the trial court felt that it was required to sentence the defendant to what it did? And had it been given some exercise of discretion, would it have come up with a minimum sentence? It's possible. And I guess my only reservation would be that if there was additional evidence that might be germane to the issue of sentencing at this point, that would not be before this court. You're talking about things that might have happened in the penitentiary session. Correct. That would not be before this court, and perhaps that would weigh upon any further sentencing decisions. So to that extent, I would advocate that it be remanded for resentencing. What about the issue of... It doesn't sound like there was a great deal of testimony taken at the actual sentencing hearing in light of what the judge believed that he was required to do. The state, I think, is asking for a remand. Do you want evidence subsequent to the time, or do you want evidence that would have been relevant at the time? What would you be looking to present? Well, I would want both presented at once. It did appear that there was, of course, a precedence investigation done. It didn't reveal a substantial criminal history. In fact, I believe he had no criminal history other than one driving while licensed, suspended, or revoked. I don't recall. Or operating an uninsured motor vehicle might be a petty offense. But it did appear that there was not a lot of evidence presented at that hearing. And so I would want a full sentencing hearing, including evidence that would be subsequent to his incarceration. Could it be said that because no evidence was presented at that time, both you and the defense counsel have waived the right to present evidence since nobody really knew about this law, apparently? I suppose it could be said on remand, however. I would hope that a full panoply of the sentencing hearing with both sides presenting evidence in aggravation and mitigation could be had. Getting back to the- I really just want to hear your response to one of the counsel's arguments. And that is that the tape shows and the transcript shows that the officer actually believed that the defendant was invoking counsel based upon his responses to that statement. Then we're still going to wait until the attorney arrives. You know, I believe the exact opposite of that, what the tape and the transcript show, is that the officer did- and he was a reasonable officer. I'm not maintaining that he wasn't. He did not understand that the defendant was unequivocally invoking counsel. And I think that that is borne out in the way that this interrogation proceeded, both prior to the statement, which opposing counsel draws as the bright line, that being the aha, and then we're still going to wait for an attorney. And as Your Honor pointed out, there's a period in the transcript. But the officer immediately thereafter says, you don't want to talk to us. You don't want to discuss the reason we're here. You're asking for, presumably, counsel. And the defendant cuts in and says, all right. And if we were going to just base it upon the transcript, he says, all right. OK, all right. It's all in capitals. Perhaps he was yelling that. It didn't seem that way to me, based on the videotape. But I would say that that small exchange certainly shows that the defendant, and based upon those earlier exchanges where he's asking, does it have to be a woman counsel? Does it have to be a female counsel? Does it have to- I don't have the money for counsel. And the officer is attempting to explain, explain. And at one point, the defendant says, oh, I understand. At that point, it does appear that he's clearly ready to waive. It's only when the officer asks him to initial the waiver form that he then says, uh-huh, and we're still going to wait for the attorney. So I believe that the transcript shows, as the videotape did, that the officer would not reasonably understand that this was, it seemed to be a question, both contextually a question and also just the way it's phrased, although there's a period. So I wholly disagree with counsel's interpretation of, excuse me, of that phrase. I would also like to say that the bright-line test that is being referred to of Edwards, based on my reading of the case law, would apply in a post-waiver situation where the defendant has to affirmatively, again, after he's waived the right to counsel. Affirmatively invoke that. Under the data standard, if there's any ambiguity, and I submit that there was plenty of ambiguity, there's no requirement that questioning cease. It's interesting to note that there was no substantive questioning at that point. It was certainly just an explanation of memorandum warnings. I refer to the sequence of those three interviews because the real statements didn't come until that third interview, which was approximately a day later, when the defendant made the statements about shaking this on seven times. But that was at least a full 24 hours after this exchange about, can counsel come right now? And I would submit that, as I did in my brief, that this was a question about the availability of counsel. The defendant was still in the decision-making process, and that's clearly what is shown in the transcript. That's what the reasonable officer would and did understand. What is your take, Mr. Stoney? I agree it is a good synopsis of the law. I don't think it affects the analysis of this case. If I recall correctly, it was recently read before counsel filed this motion. The case mainly concerned about the predominant issue in the case was whether or not the defendant, who was in the hospital and under guard, was in custody. To a lesser extent, the issue was the indication of counsel, which your Honor has found was clear. He said he wanted to call his attorney, so that factually is distinct from this case. It is clear in this case that interrogation was imminent. It's factually distinct because he actually asked a question, or he had an attorney, or what makes it specific? Because he actually asked to call an attorney. And he had his own attorney, presumably? Presumably. In this case, the defendant simply didn't understand. He was trying to call John Carver, wasn't he? That's my recollection, yes. Who wrote that? I don't think I printed it out. That was on the panel, I think. If you and Justice Jorgensen concurred, and I don't think I printed out the first solving, regarding the second issue, if I may go forward. Let me ask a question now that you've gone back there, because I had one before we got off. If there is some confusion here, or if there aren't two separate standards, why wouldn't they just put them all in one section, instead of having a 1A and a 2A, or however the statutory scheme is? You're speaking about the second issue. Right. I'll stay. I'm sorry, the question, why aren't they in one statutory section? Right. They're both in section 9, okay, 9-1. But there's an A-1 and an A-2. Correct. What's the purpose of two sections? I mean, counsel wants to tell us that there's, you know, that this doesn't make sense, that it's a confusing standard, there's only one standard. But don't we have two separate standards, or two separate set of factors set up by the two separate sections? Yes, I don't know why the legislature included them in. I believe it was one. It was strong probability of death or great bodily harm. I do think, as I argued in my brief, that the conjunctive or is clear. And I would say that while someone, I guess the argument works one way, you might say that someone would always be presumed they caused death to have known there's a strong probability of causing great bodily harm, but the converse is not true. And your Honor's decision in Dunmore, as well as the Stallions case, which you cited in Dunmore, make clear that the legislature seems to have intended that there be two separate, I would not say mental states, but two separate ways to violate this section. And are they inconsistent? That's been a finding of, I believe, the Stallions court. And I also believe this on this court in Dunmore. And I would argue that they are, as the court in Stallions, which I think concerned the felony murder rule, pointed out. I don't have to find the exact passage. Any other questions? Yes, in Stallions, there was an analysis of whether or not the verdicts were legally inconsistent. And the court found that while probably over-instructed, the jury was not mis-instructed, finding there's no inconsistencies between the verdicts and no error on the instruction. So I would argue, based on that, that they are consistent. Thank you.  Time's up. I was going to, for the record, your name is Mr. Levine. It's so that people listening on the Internet will know that there's been a change and somebody else is speaking now. Yes, Your Honor, I'm still Mark Levine from the Office of the State Appellate Defender, and I'm still representing Mr. Caveda. The transcript that we have available for us and the videotape that you say is so clear, in fact, isn't it also clear that they're just trying to get through the rights at that point? They have not completed going through all of the Miranda rights, and the officers are trying to just get through them before they do anything. Well, that's true, but one of these rights is the right to counsel, and they told him he had a right to counsel, and he said all right. Well, that's what you say, but don't they have to finish the rights and make sure he understands them all? Well, I don't know that the procedure is necessarily that formal. The officer told him you have a right to this, and he expressed a desire, you have a right to counsel, and he expressed a desire to have counsel, and the officer understood it. And I think that's the main point that I want to make today, is that what's really dispositive over here is the detective Trujillo's response, where he said, then you don't want to talk to us? Which shows that he, at that point, actually did understand, and counsel for the state said that it was an inquiry about the availability of counsel. Counsel, if he understood, and that was a question mark instead of a period, then it would seem to refute your statement that he knew, because normally a question, although there are some questions that we all know the answer to, and therefore the question is merely rhetorical, I don't think this was a rhetorical question. Which question? Do you want to talk to us? Oh. No, he didn't. The point is, he didn't say, do you want to talk to us? The point is, what he said was, then you don't want to talk to us? And that response makes no sense at all if he thinks that the man just made an inquiry. It makes sense only if the detective understood that he asked for counsel. Then you don't want to talk to us? That makes sense. It doesn't make sense to him. I think it might be reasonable to assume that the officer's statement means you've made a statement, it appears that it is equivocal, and therefore my response to you would be, then are you saying you don't want to talk to us? I.e., he is asking for an unequivocal response as to whether or not the preceding response was equivocal or indecisive or nondescript. Now, do you understand what I said when I started early on, that just because there are words on the record, they don't necessarily mean what they appear to mean? Oh, certainly. That's why we have the videotape itself in the record. And this court has the, ordinarily we defer to the trial court who has a better opportunity to observe the witnesses and so on, but here the trial court saw this same video and had no better opportunity than you. Later, although you say that this is the bright line at this location, later the same officer says, but are you sure and are you understanding that you are not asking for an attorney? That would seem to be consistent with this confusion that's going on in just trying to get through the rights and get them finished one way or the other. Get them to sign or not to sign so they can go on with whatever they're there to investigate. Well, certainly the officers want to get on with their investigation, but the hurdle they have to pass first is counsel. And we know that in the calling, our Supreme Court said that the policy favors having counsel. So rather than trying to find a way that we, not to say new, but rather detectives, rather than finding a way that we can get away without having counsel here, although I certainly understand that impulse, the Supreme Court says we want them to have counsel. That's our constitutional policy. So when he said, let me go back to this. Your question, Your Honor. Then are we still going to wait until the attorney arrives? I suppose that was a question. Then are we still going to wait until the attorney arrives? Suppose it were a question. I'm not conceding it is. It does have a period on the stipulated transcript. But suppose it were a question. He's still assuming by that question that there's an attorney going to be arriving. And why would there be an attorney arriving if he didn't want an attorney? Even if it's a question, it assumes that there's going to be an attorney coming. Well, it's also possible that the attorney could arrive despite what his intent was. Things happen beyond our control. You mean the force of the attorney on you? Yeah, something like that. The point is that your arguments are not unreasonable. But I think in this particular instance, reasonable minds could disagree as to what transpired here. And when it comes down to what was reasonable for a police officer, it becomes even more ambiguous as to what was or was not unreasonable. I've been up here for a long time, and I've learned that very often we, as three or as nine, disagree. But we aren't unreasonable about our disagreements. That's right. And so you haven't said something that has been in the back of my mind, and that is that you're the appellant. You have the burden on the view. And this is a very close case. I hope you will read the transcript over. It's set out in the appendix of my brief. See what the words were. And please look at what the detective said and what the response was. And as I say, I think it makes sense only if he did understand that this man had expressed a desire for counsel. The standard is whether what he said could reasonably be construed, as this Court has said and other courts have said, he doesn't have to say formally, I hereby request the presence of certified counsel, and he doesn't have to do that. It has to be something that can be reasonably construed as expressing his desire for counsel. And when he asks that we're going to wait until the attorney comes, now, I suppose you could say that he didn't really want the attorney to come, but there's no reason to think that. His concern was he was going to have to pay for it. And when the detective told him he wouldn't have to pay for it, he said, oh, I understand. All right. Your time is up, sir, so would you close, please? Thank you. On sentencing, he had only one driving without uninsured. That was his criminal record. Thank you very much. Thank you. Court's in recess.